## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| XINHUA WEI, derivatively on behalf of FASTLY, INC., | |
| Plaintiff, | **C.A. No.** |
| v. | |
| JOSHUA BIXBY, ADRIEL LARES, AIDA ÁLVAREZ, ARTUR BERGMAN, SUNIL DHALIWAL, DAVID M. HORNIK, CHRISTOPHER B. PAISLEY, and KELLY BRESLIN WRIGHT, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| FASTLY, INC., | |
| Nominal Defendant. | |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

## <u>INTRODUCTION</u>

Plaintiff Xinhua Wei ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Fastly, Inc. ("Fastly" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Joshua Bixby ("Bixby"), Adriel Lares ("Lares"), Aida Álvarez ("Álvarez"), Artur Bergman ("Bergman"), Sunil Dhaliwal ("Dhaliwal"), David M. Hornik ("Hornik"), Christopher B. Paisley ("Paisley"), and Kelly Breslin Wright ("Wright") (collectively, the "Individual Defendants," and together with Fastly, the "Defendants") for breaches of their fiduciary duties as directors, officers, and/or controlling shareholders of Fastly, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for contribution under Sections 10(b) and 21D of the Securities Exchange

1

Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Fastly, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Fastly's directors, officers, and controlling shareholders from May 6, 2020 through August 5, 2020, both dates inclusive (the "Relevant Period").

2.      Based in San Francisco, California, Fastly is engaged in the business of providing an edge cloud platform which allows its "customers to create great digital experiences quickly, securely, and reliably by processing, serving, and securing [its] customers' applications as close to their end-users as possible – at the edge of the internet." Fastly's customers include long-established enterprises as well as newer market entrants. Potentially, any entity which needs to maintain a robust web presence could make use of Fastly's services.

3.      Throughout the Relevant Period, the Company's SEC filings and public statements touted the strength of the Company's revenues, the increase in the average amount enterprise customers were spending, and the continuing viability of the Company's enterprise customers' accounts. Moreover, while the Company did recognize its dependence on a select few customers

in its quarterly report for the period ended March 31, 2020 that was filed on Form 10-Q with the SEC on May 8, 2020 (the "1Q20 10-Q"), Fastly did not disclose the identity of any of these customers and instead asserted that the Company's "accounts receivable credit risk exposure is limited."

4.      However, on August 5, 2020, on Fastly's second quarter 2020 earnings call (the "2Q20 Earnings Call"), Fastly revealed that its largest customer was ByteDance, the Chinese company that operates the popular mobile app and video-sharing social networking service, TikTok. In fact, over the six-month period ended June 30, 2020, TikTok accounted for 12% of Fastly's revenue. TikTok, which had approximately 850 million active monthly users as of September 2020,[1] has been an integral part of ByteDance's business since its acquisition in 2017. In turn, its success is also vital to Fastly's business operations.

5.      As was widely known at the time of the 2Q20 Earnings Call, TikTok had been under serious scrutiny by the United States government and other states and entities since at least 2019 due to national security concerns that ByteDance could be providing its users' data to Chinese Communist Party officials. These concerns were encapsulated by President Donald J. Trump's July 31, 2020 announcement that the United States would soon be banning TikTok because of these national security concerns. The revelation that ByteDance was such a major portion of Fastly's revenue stream shocked and concerned investors, as did Defendant Bixby's admission on the 2Q20 Earnings Call that "any ban of the TikTok app by the US would create uncertainty around our ability to support this customer" and that "the loss of [TikTok's] traffic would have an impact on [Fastly's] business."

---

[1] https://wallaroomedia.com/blog/social-media/tiktok-statistics/#:~:text=Monthly%20Active%20Users%20%E2%80%93%20TikTok%20has,of%20now%20(September%202020). Last visited December 16, 2020.

6.     On this news, Fastly's share price fell to $89.64 on August 6, 2020, $19.28 or over 17.7%, off its previous day's closing price of $108.92. That same day, President Trump issued Executive Order 13942, titled "Addressing the Threat Posed by TikTok,"[2] (the "August 2020 Executive Order") which formalized the TikTok ban to take effect in forty-five days. Fastly's share price continued to fall an additional $10.31 or over 11.5%, to close at $79.33 on August 7, 2020. These drops, totaling $29.59 per share, represented just under a 27.2% reduction in value from close on August 5, 2020 to close on August 7, 2020.

7.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to make a series of materially false and/or misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) ByteDance, the developer and parent company of TikTok, was Fastly's largest customer; (2) ByteDance was facing intense scrutiny due to certain known security risks including TikTok posing a threat to U.S. national security; and (3) as a result of the foregoing, there was a material and increased risk that the U.S. government would take adverse action against ByteDance and/or TikTok which would render Fastly unable to conduct business with ByteDance and/or TikTok and severely impact the Company's business operations. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

8.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

---

[2] E.O. 13942, 85 Fed. Reg. 48,637 (Aug. 6, 2020).

9.      Also in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

10.     In light of the Individual Defendants' misconduct, which has subjected Fastly to being named, along with the Company's Chief Executive Officer ("CEO") and its Chief Financial Officer ("CFO"), as a defendant to a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of California (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

11.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the CEO's and CFO's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Fastly's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 21D of the Exchange Act, 15 U.S.C. § 78u-

4(f), and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

13.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

14.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

15.     Venue is proper in this District because Fastly is incorporated in this District. In addition, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

16.     Plaintiff is a current shareholder of Fastly. Plaintiff has continuously held Fastly common stock at all relevant times.

### Nominal Defendant Fastly

17.     Fastly is a Delaware corporation with its principal executive offices at 475 Brannan Street, Suite 300, San Francisco, California 94107. Fastly's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "FSLY."

18.     The company's common stock is divided into two classes: Class A and Class B. Class B common stock differs from Class A common stock in that each Class B common stock share is entitled to ten votes as opposed to one. Class B common stock was given to certain Company insiders and early investors, and automatically converts to Class A common stock, under most circumstances, if transferred. Regardless of transfers, all remaining Class B common stock will automatically convert to Class A common stock seven years after the initial public offering ("IPO"), which occurred in May 2019.

**Defendant Bixby**

19.     Defendant Bixby has served as the Company's CEO and as a Company director since February 2020. He has also served on the Company's executive leadership team since December 2015. Previously, he served as Fastly's President from May 2017 to February 2020 and, before that, as a part-time advisor beginning in 2013. According to the Company's Schedule 14A filed with the SEC on April 24, 2020 (the "2020 Proxy Statement"), as of March 15, 2020, Defendant Bixby had beneficial ownership of 1,562 shares of Class A and 808,565 shares of Class B common stock, which represented 2.5% of total voting power on that date. Valued at $14.00 per share, the closing price on March 13, 2020,[3] Defendant Bixby owned approximately $11.3 million worth of Fastly Class A and B stock.

20.     Per the 2020 Proxy Statement, Defendant Bixby is entitled to a base salary of $35,568 in compensation for 2020 which increases to $504,000 annually starting January 1, 2021. Moreover, he has the option of decreasing this annual salary in a given year and receiving the difference in value in restricted stock units ("RSUs").

21.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Bixby made the following sales of Company Class A stock:

| Date | Number of Shares | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| June 26, 2020 | 10,000 | $84.73 | $847,300 |
| July 10, 2020 | 20,000 | $95.64 | $1,912,800 |

22.     Thus, in total, before the fraud was exposed, he sold 30,000 Company shares on inside information, for which he received over $2,760,100. His insider sales, made with knowledge

---

[3] The market was closed Sunday, March 15, 2020.

of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

23.     The Company's 2020 Proxy Statement stated the following about Defendant Bixby:

*Joshua Bixby* has served as our Chief Executive Officer and as a member of our Board of Directors since February 2020, and served as our President from May 2017 to February 2020. He has been on our executive leadership team since December 2015 and served in a part-time advisory role since 2013. From February 2013 to August 2013, Mr. Bixby served as Vice President of Acceleration at Radware Ltd., a cybersecurity and application delivery solutions company. Mr. Bixby served as President and co-founder of Strangeloop Networks, a web application acceleration solutions company, from June 2006 until its acquisition by Radware in February 2013. From October 2002 to April 2006, Mr. Bixby was a co-founder, President and Chief Executive Officer of IronPoint Technology, Inc., a content management software solutions company. Mr. Bixby is the founder of Stanley Park Ventures, an early stage foundry based in Vancouver, British Columbia. Mr. Bixby earned his B.A. in Management and Business Economics from the University of Toronto. We believe that Mr. Bixby is qualified to serve as a member of our Board of Directors because of his experience with technology companies and his experience on our executive leadership team.

**Defendant Lares**

24.     Defendant Lares has served as the Company's CFO since May 2016.

25.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Lares made the following sale of Company Class A stock:

| Date | Number of Shares | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| July 15, 2020 | 4,000 | $80.25 | $321,000.00 |

26.     His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

27.     The Company's 2020 Proxy Statement stated the following about Defendant Lares:

*Adriel Lares* has served as our Chief Financial Officer since May 2016. From July 2015 to November 2015, Mr. Lares served as an advisor to Lookout, Inc., a mobile security firm. From February 2012 to July 2015, Mr. Lares served as Chief Financial Officer of Lookout, Inc. From September 2010 to February 2012, Mr. Lares served as Business Unit Manager of 3PAR Inc., a data storage and information storage software company and a division of Hewlett Packard's Storage Unit. From January 2005 to September 2010, Mr. Lares served as Chief Financial Officer at 3PAR Inc. From March 2004 to January 2005, Mr. Lares served as the Treasurer of 3PAR Inc, and from March 2001 to March 2004, he served as the Director of Finance at 3PAR Inc. Mr. Lares is also a co-founder of Memento Mori, a Napa-based winery. Mr. Lares earned his B.A. in Economics from Stanford University.

**Defendant Álvarez**

28.     Defendant Álvarez has served as a Company director since August 2019. She also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee.

29.     For the fiscal year ending December 31, 2020, Defendant Álvarez is entitled to $30,000 in fees earned or paid in cash for serving on the Board, $7,500 for serving as the Chair of the Nominating and Corporate Governance Committee, and $5,000 for serving as a member of the Compensation Committee. Defendant Álvarez will also receive up to $175,000 in stock awards.

30.     The Company's 2020 Proxy Statement stated the following about Defendant Álvarez:

*The Honorable Aida Álvarez* has served as a member of our Board of Directors since August 2019. Ms. Álvarez has led important financial and government agencies and served in the cabinet of U.S. President William J. Clinton as the Administrator of the U.S. Small Business Administration. Ms. Álvarez serves on the board of directors of HP Inc., a technology company, Oportun Financial Corporation, a financial services company, and K12 Inc., a for-profit education company. She has previously served on the board of directors of Wal-Mart Stores, Inc., a retail company, MUFG Americas Holdings Corporation, a banking corporation, Zoosk, an online dating company, and PacifiCare Health Systems, Inc. Ms. Álvarez is the founding Chair of the Latino Community Foundation. Ms. Álvarez holds a B.A. from Harvard College. We believe that Ms. Álvarez is qualified to serve as a member of our Board of Directors because of her extensive experience in the technology and finance industries and her service on public company boards.

**Defendant Bergman**

31.     Defendant Bergman has served as a Company director since March 2011 and as the Company's Chief Architect, Executive Chairperson, and Chairperson of the Board since February 2020. Previously, he served as the CEO from founding, in March 2011, until February 2020. According to the 2020 Proxy Statement, as of March 15, 2020, Defendant Bergman beneficially owned 11,805,423 shares of the Company's Class B common stock, which represented 36% of the total voting power as of that date making him a controlling shareholder. Given that the price per share of the Company's common stock at the close of trading on March 13, 2020 was $14.00 per share, Defendant Bergman owned over $165.2 million worth of Fastly Class B stock.

32.     For the fiscal year ending December 31, 2020, Defendant Bergman is entitled to a base salary of $35,568 which will increase to $504,000 annually in 2021. Like Defendant Bixby, he may elect to receive less and take the difference in value in the form of RSUs. Additionally, on August 15, 2020, Defendant Bergman received the first installment of RSUs under a different stock option plan, with the remaining installments vesting quarterly over the next three years.

33.     The Company's 2020 Proxy Statement stated the following about Defendant Bergman:

> *Artur Bergman* has served as our Chief Architect and Executive Chairperson and Chairperson of the Board of Directors since February 2020. He served as our Chief Executive Officer from Fastly's founding in March 2011 until February 2020 and as a member of our Board of Directors since March 2011. From September 2007 to June 2011, Mr. Bergman served as Manager, Vice President, then Chief Technology Officer of Wikia, Inc., a global community knowledge-sharing platform. From November 2005 to March 2007, Mr. Bergman served as Engineering Manager for SixApart, a social networking service. From the second half of 2003 to August 2005, Mr. Bergman served as Engineering Manager of Fotango, Ltd., a subsidiary of Canon Europe. We believe that Mr. Bergman is qualified to serve as a member of our Board of Directors because of his industry knowledge and his experience as our founder, as well as his leadership experience and deep technical expertise.

**Defendant Dhaliwal**

34.     Defendant Dhaliwal has served as a Company director since March 2011. He also serves as a member of the Audit Committee. According to the 2020 Proxy Statement, as of March 15, 2020, Defendant Dhaliwal beneficially owned 103,687 shares of Class A and 3,937,741 shares of Class B common stock, representing 12.4% of total voting power. Given that the price per share of the Company's common stock at the close of trading on March 13, 2020 was $14.00 per share, Defendant Dhaliwal owned more than $56.5 million worth of Fastly Class A and B stock.

35.     For the fiscal year ending December 31, 2020 is entitled to $30,000 in fees earned or paid in cash for serving as a director, and an additional $10,000 for serving as a member of the Audit Committee. Defendant Dhaliwal will also receive up to $175,000 in stock awards.

36.     The Company's 2020 Proxy Statement stated the following about Defendant Dhaliwal:

> *Sunil Dhaliwal* has served as a member of our Board of Directors since March 2011. Mr. Dhaliwal is a general partner of Amplify Partners, a venture capital firm. Prior to founding Amplify Partners, Mr. Dhaliwal served as a General Partner of Battery Ventures, a venture capital and private equity firm, where he worked from 1998 to 2012. Mr. Dhaliwal previously worked in investment banking at Alex. Brown & Sons, Inc. from 1996 to 1998. He currently serves on the board of directors of several privately held technology companies. Mr. Dhaliwal holds a B.S. in Finance and International Business from Georgetown University. We believe that Mr. Dhaliwal is qualified to serve as a member of our Board of Directors because of his extensive experience with technology companies in our industry, his service on private company boards, and the historical knowledge and continuity he brings to our Board of Directors.

**Defendant Hornik**

37.     Defendant Hornik has served as a Company director since February 2013 and as the Company's Lead Independent Director since February 2020. He also serves as the Chair of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. According to the 2020 Proxy Statement, as of March 15, 2020, Defendant Hornik

beneficially owned 179,630 shares of Class A and 5,304,855 shares of Class B common stock, which represented 16.7% of total voting power. Given that the price per share of the Company's common stock at the close of trading on March 13, 2020 was $14.00 per share, Defendant Hornik owned more than $76.7 million of Fastly Class A and B stock.

38.     For the fiscal year ending December 31, 2020, Defendant Hornik is entitled to $30,000 in fees earned or paid in cash for serving as a director, an additional $10,000 for chairing the Compensation Committee, and $3,750 more as a member of the Nominating and Corporate Governance Committee. Defendant Hornik will also receive up to $175,000 in stock awards.

39.     The Company's 2020 Proxy Statement stated the following about Defendant Hornik:

> *David M. Hornik* has served as the Lead Independent Director of our Board of Directors since February 2020 and as a member of our Board of Directors since February 2013. Since 2000, Mr. Hornik has been a partner at August Capital, a venture capital firm. From August 2004 to September 2017, Mr. Hornik served as a member of the board of directors of Splunk, Inc, a software and data solutions company. Mr. Hornik has served as a member of the board of directors of Bill.com, a cloud-based software company that automates back-office financial operations, since May 2016. Prior to joining August Capital, Mr. Hornik was an intellectual property and corporate attorney at the law firms of Venture Law Group and Perkins Coie LLP, and a litigator at the law firm of Cravath, Swaine & Moore LLP. Mr. Hornik holds an A.B. from Stanford University, an M.Phil from Cambridge University and a J.D. from Harvard Law School. We believe that Mr. Hornik is qualified to serve as a member of our Board of Directors because of his extensive experience with technology companies in our industry, his service on public and private company boards, and the historical knowledge and continuity he brings to our Board of Directors.

**Defendant Paisley**

40.     Defendant Paisley has served as a Company director since July 2018. He also serves as the Chair of the Audit Committee and as a member of the Nominating and Corporate Governance Committee. According to the 2020 Proxy Statement, as of March 15, 2020, Defendant Paisley beneficially owned 229,838 shares of the Company's Class B common stock. Given that

the price per share of the Company's common stock at the close of trading on March 13, 2020 was

$14.00 per share, Defendant Paisley owned more than $3.2 million worth of Fastly Class B stock.

      41.     For the fiscal year ending December 31, 2020, Defendant Paisley is entitled to

$30,000 in fees earned or paid in cash for serving as a director, an additional $20,000 for chairing

the Audit Committee, and $3,750 more as a member of the Nominating and Corporate Governance

Committee. Defendant Paisley will also receive up to $175,000 in stock awards.

      42.     The Company's 2020 Proxy Statement stated the following about Defendant

Paisley:

> *Christopher B. Paisley* has served as a member of our Board of Directors since July 2018. Since January 2001, Mr. Paisley has served as the Dean's Executive Professor of Accounting at the Leavey School of Business at Santa Clara University. Mr. Paisley also serves as lead independent director of Equinix, Inc., a provider of network colocation, interconnection, and managed services, as a member of the board of Fortinet, Inc., a cybersecurity software company and a member of the board of directors of Ambarella, Inc., a developer of low-power, high-definition video compression and image processing semiconductors. Mr. Paisley is currently a member of the board of directors of Fitbit, Inc., a connected health and fitness company, ("Fitbit"). He has notified Fitbit that he does not intend to stand for re-election as a director of the company and his term will end at Fitbit's 2020 annual meeting of shareholders. Mr. Paisley previously served as a director of Bridge Bank from August 2011 until June 2015, a director of Control4, a home automation company, from May 2006 until August 2015, and a director of YuMe, Inc., a provider of digital video brand advertising solutions, from November 2012 until its acquisition by RhythmOne plc in February 2018. Mr. Paisley holds a B.A. in business economics from the University of California at Santa Barbara and an M.B.A. from the Anderson School at the University of California at Los Angeles. We believe that Mr. Paisley's substantial experience in the technology industry qualifies him to serve on our Board of Directors.

### Defendant Wright

      43.     Defendant Wright has served as a Company director since June 2018. She also

serves as a member of the Audit Committee and as a member of the Compensation Committee.

According to the 2020 Proxy Statement, as of March 15, 2020, Defendant Wright beneficially

owned 226,838 shares of the Company's Class B common stock. Given that the price per share of

the Company's common stock at the close of trading on March 13, 2020 was $14.00 per share, Defendant Wright owned over $3.1 million worth of Fastly Class B stock.

44.     For the fiscal year ending December 31, 2020, Defendant Wright is entitled to $30,000 in fees earned or paid in cash for serving as a director, an additional $10,000 as a member of the Audit Committee, and $5,000 more as a member of the Compensation Committee. Defendant Wright will also receive up to $175,000 in stock awards.

45.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Wright made the following sale of Company Class A stock:

| Date | Number of Shares | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| July 28, 2020 | 4,000 | $81.47 | $325,880.00 |

46.     Her insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

47.     The Company's 2020 Proxy Statement stated the following about Defendant Wright:

> *Kelly Wright* has served as a member of our Board of Directors since June 2018. From February 2005 to December 2016, Ms. Wright served as the Executive Vice President, Sales of Tableau Software, a software company. Prior to 2005, Ms. Wright served as Vice President of Sales at AtHoc, Inc., a software company. She holds an B.A. in Political Science from Stanford University and an M.B.A. from The Wharton School at the University of Pennsylvania. We believe that Ms. Wright is qualified to serve as a member of our Board of Directors because of her experience growing sales organizations at various technology companies.

14

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

48.     By reason of their positions as officers, directors, controlling shareholders, and/or fiduciaries of Fastly and because of their ability to control the business and corporate affairs of Fastly, the Individual Defendants owed Fastly and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Fastly in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Fastly and its shareholders so as to benefit all shareholders equally.

49.     Each controlling shareholder, director, and officer of the Company owes to Fastly and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

50.     The Individual Defendants, because of their positions of control and authority as directors, officers, and/or controlling shareholders of Fastly, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

51.     To discharge their duties, the officers, directors, and controlling shareholders of Fastly were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

52.     Each Individual Defendant, by virtue of his or her position as a director, officer, and/or controlling shareholder owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors, officers, and/or controlling shareholders of

Fastly, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers, directors, and/or controlling shareholders of the Company has been ratified by the remaining Individual Defendants who collectively comprised Fastly's Board at all relevant times.

53.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants, including Defendant Bergman as a controlling shareholder, had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

54.     To discharge their duties, the officers and directors of Fastly were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Fastly were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Fastly's own Code of Business Conduct and Ethics (the "Code of Ethics");

(b)      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)      remain informed as to how Fastly conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)      establish and maintain systematic and accurate records and reports of the business and internal affairs of Fastly and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Fastly's operations would comply with all applicable laws and Fastly's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate

disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

55.     Each of the Individual Defendants further owed to Fastly and the shareholders the duty of loyalty requiring that each favor Fastly's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

56.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Fastly and were at all times acting within the course and scope of such agency.

57.     Because of their advisory, executive, managerial, and directorial positions with Fastly, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

58.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Fastly.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

59.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

60.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal

18

adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) to artificially inflate the Company's stock price.

61.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Fastly was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

62.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

63.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Fastly, and was at all times acting within the course and scope of such agency.

## **FASTLY'S CODE OF ETHICS**

64.     Fastly's Code of Ethics provides that "it is an overview of the guiding principles we expect all of our employees to follow" and that "anyone who works for Fastly, or with Fastly,

must follow our ethical and legal guidelines. This includes employees, contractors, consultants,

partners, suppliers, agents, volunteers, and representatives."

65.     In a section titled, "Conflicts of Interest," the Code of Ethics states the following:

As a Fastly employee, your loyalty should remain to the company. Conflicts of interest wedge themselves between your personal interests and your performance at the company. It only takes one person outside of Fastly to perceive a potential conflict, which could harm our reputation. Here are a few examples of conflicts of interest:

● Working at a company competitive to Fastly, or starting a company competitive to Fastly.

● Investing in a company that competes with Fastly (other than minimal stock investment in a public company).

● Hiring, employing, or selecting suppliers or contractors based on anything but their fit for the job and interest in Fastly. All of Fastly's purchases should be made on the basis of quality, suitability, service, price, and efficiency. We treat our suppliers fairly and equally and award contracts on the basis of merit and without favoritism.

It's your responsibility to report anything that might be perceived as a conflict of interest to our Office of the General Counsel (or if you're an executive, to the Board of Directors).

66.     In a section titled, "Insider Trading," the Code of Ethics states the following, in

relevant part:

The bottom line on insider trading is that if you are aware of material nonpublic information about Fastly or another publicly traded company that Fastly has business relationships with and you trade in Fastly's or such other company's securities, you have broken the law. It does not matter whether the decision to buy or sell was influenced by the material nonpublic information, how many shares you buy or sell, or whether it has an effect on the stock price.

Regardless of who you are, if you know something material about the value of a security that not everyone knows and you trade (or convince someone else to trade) in that security, you may be found guilty of insider trading. If you are uncertain of whether information might be "material" or "nonpublic" do not hesitate to reach out to The Office of the General Counsel.

67.     In a section titled, "Be fair, honest, and ethical—always," the Code of Ethics states the following, in relevant part:

> This ethos extends across the board. Whether you're dealing with colleagues, customers, suppliers, partners or competitors, it's important to always be fair, honest, and ethical. This means no deception, misrepresentation, plagiarism, or manipulation of facts — from making false product and service statements to filing misleading financial documents.

68.     In a section titled, "The Original Fastly Code of Conduct," the Code of Ethics states that, "[w]e comply with all applicable laws and regulations."

69.     The Code of Ethics also provides the following:

> We take our company policies seriously because they keep our colleagues, customers, suppliers, and partners safe. That's why anyone who works for Fastly, or with Fastly, must follow our ethical and legal guidelines. This includes employees, contractors, consultants, partners, suppliers, agents, volunteers, and representatives.

> At the heart of the matter, if you disregard or violate Fastly's policies, you could be putting the company and our employees at risk. Any violation will have serious consequences, including possible dismissal. Certain violations may even need to be handled by legal authorities for investigation and prosecution.

70.     In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act, and aiding and abetting thereof. Moreover, three of the Individual Defendants violated the Code of Ethics by engaging in insider trading. Also in violation of the Code of Ethics, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in a fair, honest, and ethical manner, and properly report violations of the Code of Ethics.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

71.     Based in San Francisco, California, Fastly is engaged in the business of providing an edge cloud platform which allows its "customers to create great digital experiences quickly, securely, and reliably by processing, serving, and securing [its] customers' applications as close to their end-users as possible – at the edge of the internet." Fastly's customers include long-established enterprises as well as newer market entrants. Potentially, any entity which needs to maintain a robust web presence could make use of Fastly's services.

72.     According to the Company's most recent annual report filed on Form 10-K with the SEC on March 4, 2020, Fastly employs 630 employees in 16 different countries. The Company's 74 terabit[4] network is located in 58 points of presence across 53 markets. As of December 2019, the Company was servicing 288 enterprise customers who accounted for approximately 87% of the Company's total revenue.

73.     Founded in March 2011, Fastly went public in May 2019. The Company was member of a tech-heavy 2019 IPO class which included Lyft, Uber, Pinterest, and Zoom. Fastly sold 11.25 million shares for $16 per share which raised approximately $180 million for the Company. Although Fastly's revenue growth had increased leading up to the IPO, the Company has been netting millions of dollars in losses for at least the previous three fiscal years.

74.     As revealed in the 1Q20 10-Q, the Company had "material weaknesses" in its internal control and reporting processes for the previous three fiscal years. While the 1Q20 10-Q identified steps the Company had been purportedly taking to remediate these inadequate controls

---

[4] A terabit is a multiple of the unit bit for digital information or computer storage. Specifically, a terabit is used for measuring the amount of data that is transferred in a second between two telecommunication points or within network devices. In measuring data transmission speed, a terabit is one trillion binary digits or bits.

and processes, the 1Q20 10-Q admitted that "the material weaknesses cannot be considered remediated until the applicable remedial controls operate for a sufficient period of time and management has concluded, through testing, that these controls are operating effectively." Failing to maintain adequate internal controls and procedures is a breach of fiduciary duty and no doubt contributed to the Individual Defendants releasing false and misleading statements, as described below, to the investing public.

75.     Leading up to and throughout the Relevant Period, it was widely known that ByteDance was at risk of adverse action by the U.S. government due to its ownership of the popular mobile app, TikTok. Tik Tok is most known for hosting fifteen-second user-made videos where various content creators typically film themselves dancing, lip-syncing to popular audio clips, or doing anything else which might attract views from fellow users. ByteDance acquired TikTok's predecessor, Musical.ly, in 2017, and transformed the service into the global phenomenon it has become in its current iteration today. However, because ByteDance is headquartered in Beijing, China many observers have expressed concerns that the Chinese government can access whatever data it wants off of ByteDance's servers under Chinese law. This is concerning given that TikTok has private user data for over 850 million active users, including an estimated 80 million Americans, as of September 2020.

76.     In fact, going back to late 2019, many news outlets heavily reported on the potential national security threat that TikTok posed and also the U.S. government investigations of ByteDance. By way of example, on October 24, 2019, the *Washington Post* published an article titled, "TikTok raises national security concerns in Congress as Schumer, Cotton ask for federal review"; on November 1, 2019, *Reuters* published an article titled, "Exclusive: U.S. opens national security investigation into TikTok – sources"; and on December 16, 2019 *Vox* published an article

titled, "What's going on with TikTok, China, and the US government?". Additionally, on February 25, 2020, more than two months before the Relevant Period began, *Business Insider* published an article titled, "US government agencies are banning TikTok, the social media app teens are obsessed with, over cybersecurity fears – here's the full list."

77.     As described in the abovementioned news articles, the U.S. government launched an investigation into TikTok's business practices and the potential threats it posed to national security in late 2019. Moreover, around the same time, U.S. senators were publicly calling on the acting Director of National Intelligence to open yet additional investigations. Further, in June 2020, India banned TikTok citing the threats the app posed to Indian national security. Also in June 2020, the European Data Protection Board assembled a task force to investigate TikTok's handling of private data as well as to assess security risks in connection to the app.

78.     Notwithstanding the apparent risk to ByteDance, the Individual Defendants continued to make, and caused the Company to make, materially false and misleading statements which failed to disclose that ByteDance was a significant portion of the Company's revenue, downplayed the risk of losing any of their significant customers' business, and therefore misled investors about the strength of the Company's operations.

**False and Misleading Statements**

*May 6, 2020 Shareholder Letter*

79.     On May 6, 2020, the Company issued a letter to its shareholders (the "1Q20 Shareholder Letter") discussing the Company's performance in the first quarter of 2020. The 1Q20 Shareholder Letter is addressed from Defendant Bixby, and was filed with the SEC on that same date as an exhibit attached to a current report on Form 8-K which was signed by Defendant Lares.

80.     The 1Q20 Shareholder Letter highlighted a number of performance metrics including Fastly's "[s]trong top-line growth with revenue of $63 million, up 38% year-over-year." Moreover, it touted that "[t]otal enterprise customer count [increased to] 297, up from 288 in Q4 2019." In addition, the 1Q20 Shareholder Letter noted that "[a]verage enterprise customer spend [is] approximately $642,000, up from $607,000 in Q4 2019," and that these "[e]nterprise customers generated 88% of [the Company's] trailing twelve-month total revenue, up from 87% in Q4 2019."

81.     The 1Q20 Shareholder Letter further stated the following:

Turning to the quarter – we delivered solid results. ***We generated $63 million in revenue, up 38% year-over-year, and increased our enterprise customer count to 297 from 288 in the previous quarter.*** We continued to drive expansion within our customer base with a DBNER of 133% and ***our average enterprise customer spend continued to increase to $642,000 from $607,000 in the previous quarter***. These results were primarily driven by continued strong business fundamentals and ***further adoption of our edge cloud platform by enterprise organizations across multiple verticals and geographies, including high margin verticals such as FinTech and ecommerce.*** Additionally, this momentum was supplemented by increased internet usage as social distancing measures were implemented in the second half of March. Suffice it to say, the internet and our business are thriving, in part due to our ability to serve as a trustworthy partner for innovative enterprises around the globe.

Fastly is the platform of choice for innovators. ***We partner with the most technologically advanced and creative companies who we believe will not only weather this storm, but will continue to thrive in this environment***. Companies are increasingly recognizing the importance of digital transformation, not only to survive during these uncertain times, but also for long-term success. As we are seeing this trend accelerate and evolve, we believe we are best positioned to partner and grow with these companies as they look for a trustworthy and modern platform. For these reasons, we are even more inspired as we continue building and investing in our network and offerings.

Despite the current global economic uncertainty, ***we remain confident in the demand for our mission-critical services and the continued growth of our business*** in 2020 and the years to come. As such, we have raised guidance for 2020 and expect to make further progress on our path to profitability.

(Emphasis added.)

*May 6, 2020 Earning Call*

82.     The same day as the 1Q20 Shareholder Letter was issued, the Company held an earnings call on which Defendants Bixby and Lares discussed Fastly's financial results for the first fiscal quarter of 2020.

83.     On that call, the following exchange occurred between Charlie Erlikh, an analyst from Baird, and Defendants Bixby and Lares:

> Erlikh: Great. Thanks. ***And I'm also wondering if you could unpack maybe your assumptions in Q2 and for the rest of the year in terms of*** maybe contract repricings or customer non-payments or ***things related to some of the customer segment feeling pressure.*** I know it's a small percentage, but are you baking in some assumptions for bad debt or contract repricings and things like that?

> Bixby: Sure. Let me go at that at a high level, and then I'll hand it off to Adriel. I think at a high level, the fact that we are a platform for innovators and the innovators are seeing success in this market because they digitally transformed and built their businesses for exactly these moments, I think that is a very different profile than you'd see in others. But like everyone, there's some exposure and Adriel has some more -- would have some more insight into that.

> Lares: Yeah. Thanks, Joshua and thanks, Charlie for the question. ***Yeah. At least at this time, we're not seeing anything yet*** and to Joshua's point, the ***majority of the customers that we have on our platform are those innovators,*** are those sort of larger enterprise customers which ***makes up the bulk of our revenue. And so far, they seem to be in good shape***. There was a slight uptick in DSO, but there wasn't anything concerning from a long-term basis, at least what we can see right now. It is something that we continue to monitor on sort of a weekly basis, daily basis. ***But at this time, we're not seeing anything at least concerning from sort of a Q2 perspective.***

(Emphasis added.)

*May 8, 2020 Form 10-Q*

84.     On May 8, 2020, the company filed the 1Q20 10-Q which was signed by Defendants Bixby and Lares and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a)

under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX Certifications") which were also signed by Defendants Bixby and Lares. These SOX Certifications attested to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

85.    Regarding, "Risks Related to Our Business and Industry," the 1Q20 10-Q stated the following:

> ***We receive a substantial portion of our revenues from a limited number of customers, and the loss of, or a significant reduction in usage by, one or more of our major customers would result in lower revenues and could harm our business.***
>
> Our future success is dependent on establishing and maintaining successful relationships with a diverse set of customers. We currently receive a substantial portion of our revenues from a limited number of customers. ***For trailing 12 months ended March 31, 2020, our top ten customers accounted for approximately 31% of our revenue. It is likely that we will continue to be dependent upon a limited number of customers for a significant portion of our revenues for the foreseeable future*** and, in some cases, the portion of our revenues attributable to individual customers may increase in the future. ***The loss of one or more key customers or a reduction in usage by any major customers would reduce our revenues. If we fail to maintain existing customers or develop relationships with new customers, our business would be harmed***.

(First emphasis in original. Second and third emphases added.)

86.    Regarding "Concentrations of Credit Risk," the 1Q20 10-Q also stated:

> Concentrations of credit risk with respect to accounts receivable are primarily limited to certain customers to which we make substantial sales. Our customer base consists of a large number of geographically dispersed customers diversified across several industries. ***To reduce risk, we routinely assess the financial strength of our customers. Based on such assessments, we believe that our accounts receivable credit risk exposure is limited. One customer accounted for 10.5% of revenue for the three months ended March 31, 2020, and 14.6% of the total accounts receivable balance as of March 31, 2020.*** No customer accounted for more than 10% of revenue for the three months ended March 31, 2019, or more than 10% of the total accounts receivable balance as of December 31, 2019.

(Emphasis added.)

87.     The statements contained in ¶¶ 79–86 were materially false and/or misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) ByteDance, the developer and parent company of TikTok, was Fastly's largest customer; (2) ByteDance was facing intense scrutiny due to certain known security risks including TikTok posing a threat to U.S. national security; and (3) as a result of the foregoing, there was a material and increased risk that the U.S. government would take adverse action against ByteDance and/or TikTok which would render Fastly unable to conduct business with ByteDance and/or TikTok and severely impact the Company's business operations. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

## THE TRUTH EMERGES

88.     The truth as to the impact on Fastly's business of a U.S. ban on ByteDance emerged on August 5, 2020 when, on the 2Q20 Earnings Call, Defendant Bixby disclosed that, "***ByteDance, the operator of TikTok, was our largest customer in the quarter. Any ban on the TikTok app by the U.S. would create uncertainty around our ability to support this customer***. While we believe we are in a position to backfill the majority of this traffic in case they are no longer able to operate in the U.S., *the loss of this customer's traffic would have an impact on our business.*" (Emphasis added.)

89.     Defendant Lares added, in response to questioning, that TikTok's traffic accounted for "***12% of revenue*** for the last six months ending June 30, 2020. Yes, *we have not talked about what it was previous to that*." (Emphasis added.)

90.     On this news, Fastly's share price fell to $89.64 on August 6, 2020, $19.28 or over 17.7% off its previous day's closing price of $108.92.

91.     That same day, on August 6, 2020, President Trump signed the August 2020 Executive Order which formalized the TikTok ban to take effect in forty-five days.

92.     On this news, Fastly's share price continued to fall an additional $10.31 or over 11.5%, to close at $79.33 on August 7, 2020. Taken together, these two price drops totaled $29.59 per share and represented just under a 27.2% reduction in value from close on August 5, 2020 to close on August 7, 2020.

## DAMAGES TO FASTLY

93.     As a direct and proximate result of the Individual Defendants' conduct, Fastly will lose and expend many millions of dollars.

94.     Such expenditures include, but are not limited to, costs associated with and/or legal fees associated with the Securities Class Action filed against the Company, its CEO and its CFO, and any internal investigations and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

95.     Additionally, these expenditures include, but are not limited to, compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

96.     As a direct and proximate result of the Individual Defendants' conduct, Fastly has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

97.     Plaintiff brings this action derivatively and for the benefit of Fastly to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their

fiduciary duties as directors, officers, and/or controlling shareholders of Fastly, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act, as well as the aiding and abetting thereof.

98.   Fastly is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

99.   Plaintiff is, and has been at all relevant times, a shareholder of Fastly. Plaintiff will adequately and fairly represent the interests of Fastly in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

100.   Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

101.   A pre-suit demand on the Board of Fastly is futile and, therefore, excused. At the time of filing of this complaint, the Board consists of the following seven individuals: Defendants Bixby, Álvarez, Bergman, Dhaliwal, Hornik, Paisley, and Wright (the "Directors"). Plaintiff needs only to allege demand futility as to four of the seven Directors that were on the Board at the time of the filing of this complaint.

102.   Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause the Company to make false and misleading statements and omissions of material fact, while two of them engaged in insider sales based on material non-public information, all of which renders the Directors unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

103.   In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. While investors were duped into believing the fraud perpetrated by the Individual Defendants, two of the Directors sold Company stock at artificially inflated prices based on inside information. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

104.   Additional reasons that demand on Defendant Bixby is futile follow. Defendant Bixby has served as the Company's CEO and as a Company director since February 2020. He has also served on the Company's executive leadership team since December 2015. Previously, he served as the Company's President from May 2017 to February 2020, and, prior to that, was a part-time advisor to the Company beginning in 2013. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Bixby with his principal occupation, and he stands to receive handsome compensation for fiscal year 2020. Defendant Bixby was ultimately responsible for many of the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings referenced herein, which he either personally made or signed SOX Certifications for. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sales, which yielded over $2.7 million, demonstrate his motive in facilitating and participating in the fraud. Moreover, Defendant Bixby is a defendant in

the Securities Class Action. For these reasons, Defendant Bixby breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

105.    Additional reasons that demand on Defendant Álvarez is futile follow. Defendant Álvarez has served as a Company director since August 2019. She also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee. Defendant Álvarez has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Álvarez breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

106.    Additional reasons that demand on Defendant Bergman is futile follow. Defendant Bergman has served as a Company director since March 2011 and as the Company's Chief Architect, Executive Chairperson, and Chairperson of the Board since February 2020. Previously, he served as the Company's CEO from its founding, in March 2011, until February 2020. Moreover, with 36% of the company's voting power as of March 15, 2020, Defendant Bergman is a controlling shareholder. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Bergman with his principal occupation, and he stands to receive handsome compensation for fiscal year 2020. Defendant Bergman has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and

misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Bergman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

107.     Additional reasons that demand on Defendant Dhaliwal is futile follow. Defendant Dhaliwal has served as a Company director since March 2011. He also serves as a member of the Audit Committee. Defendant Dhaliwal has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Dhaliwal breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

108.     Additional reasons that demand on Defendant Hornik is futile follow. Defendant Hornik has served as a Company director since 2013 and as the Company's Lead Independent Director since February 2020. He also serves as the Chair of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Hornik has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Hornik breached his fiduciary duties,

faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

109.    Additional reasons that demand on Defendant Paisley is futile follow. Defendant Paisley has served as a Company director since July 2018. He also serves as the Chair of the Audit Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Paisley has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Paisley breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

110.    Additional reasons that demand on Defendant Wright is futile follow. Defendant Wright has served as a Company director since June 2018. She also serves as a member of both the Audit Committee and the Compensation Committee. Defendant Wright has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Her insider sales, which yielded $325,880, demonstrate her motive in facilitating and participating in the fraud. For these reasons, Defendant Wright breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

111.    Additional reasons that demand on the Board is futile follow.

112.    As described above, two of the Directors directly engaged in insider trading, in violation of federal law and the Company's Code of Ethics. Defendant Bixby received proceeds of nearly $2.7 million and Defendant Wright received $325,880 as a result of their insider transactions executed during the Relevant Period, when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to them, and excused.

113.    The Directors have extensive, longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For instance, Defendants Bixby and Bergman served in senior positions or as directors at Fastly for many years. Specifically, Defendant Bixby has served in executive positions at Fastly since 2015, including currently as CEO while Defendant Bergman was CEO from founding until February 2020 and is currently Chief Architect, Executive Chairperson, and Chairperson of the Board. Moreover, Defendants Bergman and Dhaliwal have served together on the Board since founding in March 2011, and Defendant Hornik has served with them since February 2013. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Directors would be futile.

114.    Defendants Dhaliwal, Paisley, and Wright (the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, among other things, the Company's quality and integrity of the Company's financial statements, the

Company's compliance with legal and regulatory requirements, the Company's financial reporting process, and the Company's internal controls over financial reporting. The Audit Committee Defendants failed to ensure the quality and integrity of the Company's financial statements, as they are charged to do under the Audit Committee Charter, allowing the Company to file false and misleading financial statements with the SEC and to fail to maintain internal controls. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

115.    In violation of the Code of Ethics, the Directors conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and the wrongdoing alleged in the Securities Class Action. In violation of the Code of Ethics, the Directors failed to comply with laws and regulations, maintain the accuracy of company records, public reports and communications, and uphold the responsibilities related thereto. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

116.    Fastly has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves, or others who were responsible for that wrongful conduct, to attempt to recover for Fastly any part of the damages Fastly suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

117.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and

intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

118.    The acts complained of herein constitute violations of fiduciary duties owed by Fastly's officers and directors, and these acts are incapable of ratification.

119.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Fastly. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Fastly, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

120.    If there is no directors' and officers' liability insurance, then the Directors will not cause Fastly to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

121.     Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

122.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

123.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Fastly's business and affairs.

124.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

125.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Fastly.

126.     In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

127.     In breach of their fiduciary duties owed to Fastly, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*: (1) ByteDance, the developer and parent company of TikTok, was Fastly's largest customer; (2) ByteDance was facing intense scrutiny due to certain known security risks including TikTok posing a threat to U.S. national security; and (3) as a result of the foregoing, there was a material and increased risk that the U.S.

government would take adverse action against ByteDance and/or TikTok which would render Fastly unable to conduct business with ByteDance and/or TikTok and severely impact the Company's business operations. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

128.    The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact.

129.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Fastly's securities and disguising insider sales.

130.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Fastly's securities and disguising insider sales.

131.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

132.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Fastly has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

133.    Plaintiff on behalf of Fastly has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Unjust Enrichment

134.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

135.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense, to the detriment, of Fastly.

136.    The Individual Defendants either benefitted financially from the improper conduct and their engaging in lucrative insider transactions tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Fastly that was tied to the performance or artificially inflated valuation of Fastly, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

137.    Plaintiff, as a shareholder and a representative of Fastly, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

138.    Plaintiff on behalf of Fastly has no adequate remedy at law.

40

## THIRD CLAIM

### Against the Individual Defendants for Abuse of Control

139.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

140.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Fastly, for which they are legally responsible.

141.    As a direct and proximate result of the Individual Defendants' abuse of control, Fastly has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Fastly has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

142.    Plaintiff on behalf of Fastly has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Gross Mismanagement

143.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

144.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Fastly in a manner consistent with the operations of a publicly-held corporation.

145.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Fastly has sustained and will continue to sustain significant damages.

146.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

147.    Plaintiff on behalf of Fastly has no adequate remedy at law.

## FIFTH CLAIM

### Against the Individual Defendants for Waste of Corporate Assets

148.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

149.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors, and business from future customers, who no longer trust the Company and its products.

150.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

151.    Plaintiff on behalf of Fastly has no adequate remedy at law.

## SIXTH CLAIM

### Against Defendants Bixby and Lares for Contribution
### Under Sections 10(b) and 21D of the Exchange Act

152.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

153.    Fastly, along with Defendants Bixby and Lares are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Bixby

and Lares's willful and/or reckless violations of their obligations as officers and/or directors of Fastly.

154.    Defendants Bixby and Lares, because of their positions of control and authority as officers and/or directors of Fastly, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Fastly, including the wrongful acts complained of herein and in the Securities Class Action.

155.    Accordingly, Defendants Bixby and Lares are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

156.    As such, Fastly is entitled to receive all appropriate contribution or indemnification from Defendants Bixby and Lares.

<u>**PRAYER FOR RELIEF**</u>

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Fastly, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached, and/or aided and abetted the breach of, their fiduciary duties to Fastly;

(c)    Determining and awarding to Fastly the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Fastly and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable

laws and to protect Fastly and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

     1.  a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

     2.  a provision to permit the shareholders of Fastly to nominate at least four candidates for election to the Board; and

     3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

    (e)    Awarding Fastly restitution from the Individual Defendants, and each of them;

    (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

    (g)    Granting such other and further relief as the Court may deem just and proper.

Dated: December 28, 2020             Respectfully submitted,

                                **FARNAN LLP**

                                /s/ Michael J. Farnan
                                Brian E. Farnan (Bar No. 4089)
                                Michael J. Farnan (Bar No. 5165)
                                919 N. Market St., 12th Floor
                                Wilmington, DE 19801
                                Telephone: (302) 777-0300
                                Facsimile: (302) 777-0301
                                Email: bfarnan@farnanlaw.com

mfarnan@farnanlaw.com

Of Counsel:

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202.3827
Email: pkim@rosenlegal.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net